John F. Devine, Administrator of the Estate of Edward J. Kelly, Deceased, Appellee, v. City of Chicago, Appellant.

Gen. No. 24,682.

1. MUNICIPAL CORPORATIONS, § 938*—*what constitutes exercise of ministerial function.* The maintenance and operation by a city of police and fire alarm wires is the exercise of a ministerial not a governmental function.

2. MASTER AND SERVANT, § 123*—*duty of a city to furnish employee safe place to work.* A city, being liable to respond in damages for its negligence when acting in a ministerial capacity, is obliged to furnish its employees a safe place to work the same as other employers of skilled or unskilled labor.

3. MASTER AND SERVANT, § 140*—*when city lineman not given safe place to work.* A city lineman engaged in repairing police and fire alarm wires, in a place where he was required to walk upon an insufficiently insulated feed wire of an electric railway company, was not furnished by the city with a safe place to work.

4. MASTER AND SERVANT, § 363*—*what risks assumed by workman.* A workman is bound to assume only those risks which are open and obvious, so that he may be able to apprise himself, in the exercise of reasonable care, of the existence of the risk and the danger arising therefrom.

5. MASTER AND SERVANT, § 304*—*what risks not assumed by employee.* A workman does not assume risks which are unusual, extraordinary or extrinsic to his employment, nor risks arising from the negligence of his employer.

6. MASTER AND SERVANT—*what risk not assumed by city lineman repairing police and fire alarm wires.* A city lineman engaged in repairing police and fire alarm wires, which were strung on poles belonging to an electric railway company, did not assume the risk arising from an insufficiently insulated feed wire, belonging to the railway company, upon which he had to walk in the discharge of his duties.

7. DEATH, § 36*—*when declaration shows commencement of action for negligent death in one year.* When the declaration in an action for negligent death averred the death of decedent on September 22, 1910, and the record showed that suit was commenced and summons issued August 30, 1911, the fact that suit was com-

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

menced within one year affirmatively appears upon the record, and a motion in arrest of judgment, because the declaration did not contain an averment that the action was commenced within one year after the death, was properly overruled.

8. PLEADING, § 451*—*how variance may be taken advantage of.* Under a declaration for the wrongful death of a lineman, which averred that decedent came to his death primarily by being electrically shocked through insufficient insulation of a feed wire upon which he stood, if the evidence showed that he was not electrically shocked, but fell to the ground by having lost his balance, or from any other cause than the one averred, that would constitute a variance which, to be availed of, required defendant to move either for an instructed verdict or a new trial upon that ground.

9. DEATH, § 506*—*when evidence sufficient to support verdict in action for wrongful death.* In an action for wrongful death of a lineman, where the declaration averred that his death was caused primarily by an electric shock which, though perhaps insufficient to cause death directly, did cause deceased to lose his hold and fall, breaking his neck, while defendant contended that he was not shocked but lost his grip and fell, and there was a conflict in the evidence and proof sufficient to support either theory, the court cannot say. that a verdict for plaintiff was not supported by the evidence.

Appeal from the Circuit Court of Cook county; the Hon. GEORGE F. BARRETT, Judge, presiding. Heard in this court at the October term, 1918. Affirmed. Opinion filed March 10, 1919. *Certiorari* denied by Supreme Court (making opinion final).

SAMUEL A. ETTELSON and WILLIAM H. DEVENISH, for appellant; EDWARD J. KELLEY, of counsel.

SCOTT O. CAVETTE, for appellee.

MR. JUSTICE HOLDOM delivered the opinion of the court.

This action was originally brought against the city and the Chicago City Railway Company for damages for negligently causing the death of plaintiff's intestate, and went to trial against both corporations. There was a verdict of not guilty against the Chicago City Railway Company and of guilty against the city

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

with damages assessed at $6,000 and a judgment upon these verdicts, from which judgment the city prosecutes this appeal and asks a reversal.

Edward J. Kelly, the plaintiff's intestate, at the time of the accident in which he lost his life, and for some time previous thereto, was what is commonly known as a "lineman." He worked around electric wires belonging to and operated by the city. Under an ordinance of the city, the Chicago City Railway Company erected and maintained certain poles upon which it strung wires electrically charged to operate its cars. Under this ordinance the city had a right to and did string and operate its police and fire alarm wires. These wires of the city were strung above those of the railway company. The theory upon which the declaration and the proofs thereunder proceed is that it was the duty of the city to furnish Kelly with a safe place in which to work; that it disregarded and neglected such duty at the time Kelly met his death; that the railway company hung a feed wire under the city wires which carried from 500 to 600 volts of electricity, and which was insufficiently insulated and therefore was not a safe place for Kelly to work.

September 22, 1910, Kelly was engaged in repairing the city wires at Seventy-First street and Cottage Grove avenue, Chicago, which had burned out the previous day. The gang in which Kelly worked started on the job at 9 o'clock in the morning and Kelly was killed at about 3 o'clock in the afternoon of the same day. Just prior to this fatality the foreman had sent Kelly to work on the wires. He went up a ladder resting against a city wire, which also touched both the lead cable and the street car feed wire. The so-called lead cable and messenger wire belonged to the city, and below them was the feed wire, which belonged to the railway company, being about 3 feet below the wires of the city. The messenger wire was a supporting wire and was without electric energy; it was used to hold up the lead cable, which was fastened to the

messenger wire by hooks referred to as "marlin" hooks. Kelly ascended the ladder, taking with him a rope referred to as a "handline," with a hook in the end of it to pull up material. When he got to the top of the ladder he dropped the hook on the feed wire and then walked with his feet on the feed wire, with his left hand holding the messenger wire, to the pole and back to the place where the ladder was. This he did to fasten the lead cable to the messenger wire by tying the marlin hooks at different distances between the pole and the ladder. Kelly tied about a dozen of these hooks between the ladder and the pole. After Kelly had been to the pole and returned to the ladder he stooped to pick up the hook hanging on the feed wire and the handline attached to it, receiving an electric shock which felled him to the ground, killing him.

It is contended that Kelly was not furnished a safe place to work, in that he was electrocuted because of a defectively insulated joint of the feed wire upon which he necessarily had to walk in doing his work; that while the electric shock may not have been sufficiently strong to have killed Kelly, it was strong enough to cause him to lose his grip and fall to the ground below, resulting in the breaking of his neck and his death.

The city argues for reversal (1) that there is no liability because at the time of the accident to Kelly the city was exercising a purely governmental function in virtue of police power; (2) that Kelly assumed the risk; (3) error in overruling the city's motion in arrest of judgment because the declaration did not contain an averment that the suit was commenced within a year after the death of Kelly.

First: Whether a city is acting in its governmental or ministerial capacity depends upon the character of the work or enterprise which the facts may develop the city was engaged in and upon which the right to maintain an action is predicated. If in a particular case it develops that the matters complained about

were governmental matters, then there is no liability, but if such matters are ministerial, then the city is civilly liable.

We think that the city in the maintenance and operation of its police and fire alarm wires may be said to maintain and operate the same in its ministerial capacity, quite as much so as the city was held to be so operating in *Johnston v. City of Chicago,* 258 Ill. 494, when operating an automobile in connection with its public library. The city owned the automobile, the instrumentality of the accident, and was using it in a branch of the city service in its maintenance and operation of a public library, and in the instant case the city owned, operated and maintained the police and fire alarm wires upon which Kelly was working when he met with the accident which killed him. In the *Johnston* case, *supra,* the distinction between the exercise of governmental and ministerial functions by a city is well defined and clearly elucidated with ample citation of authority. To that decision we refer on this point without further comment.

The city being liable to respond in damages for its negligence when acting in its ministerial capacity, the rule obligating an employer to furnish a safe place in which and safe tools and appliances with which to work, is the same in the case of a municipal corporation as with other employers of either skilled or unskilled labor. *Condon v. City of Chicago,* 249 Ill. 596.

Second: Under the proofs in this case Kelly did not assume the risks arising from the cause which eventuated in his death. A workman is bound to assume only those risks which are open and obvious, so that he may be able to apprise himself, in the exercise of reasonable care, of the existence of the risk and the danger arising therefrom so as to avoid injury to himself. So in this case, Kelly did not by his contract of employment assume the risk of an insufficiently insulated feed wire of the railway company upon which he must stand in doing the work for which the city

employed him. *Guthman v. City of Chicago,* 236 Ill. 9.

A workman does not assume risks which are unusual, extraordinary or extrinsic to his employment, nor risks which arise from the negligence of the employer. Applying this rule to the instant case, Kelly did not assume the risk flowing from an insufficiently insulated feed wire of the railway company upon which he necessarily had to walk in the discharge of his duties. *City of La Salle v. Kostka,* 190 Ill. 130.

Third: The contention of the city, that the court erred in overruling its motion in arrest of judgment because the declaration did not contain any averment that the action was commenced within one year of the death of Kelly, is not well taken. The record shows that the suit was commenced within the limitation of one year. The declaration averred the date of the death of Kelly as September 22, 1910, and the record showed that the suit was commenced and summons issued on August 30, 1911. The fact that the suit was commenced within a year from the death of Kelly affirmatively appears upon the record.

No questions arise upon the pleadings or that the verdict is not supported by the evidence if the action is maintainable, or that the damages are excessive. It is, however, contended that Kelly did not come to his death from an electrical shock, but that he lost his grip and fell from the wire to the ground, breaking his neck, from which injury he died.

There is evidence in the record to sustain this contention if the jury gave it credence. Whether Kelly came to his death as the result of an electrical shock or by simply falling from the feed wire of the railway company was squarely before the jury for their decision, and, as there is a conflict in the evidence and proofs sufficient to support either theory, we cannot say that the verdict which the jury rendered is not supported by the evidence. The declaration averred that Kelly came to his death primarily by being electrically shocked through insufficient insulation of the

railway company's feed wire upon which he stood. If the evidence proved that Kelly was not electrically shocked, but fell from the feed wire to the ground by having lost his balance, or for any other cause than the one averred, that would constitute a variance between the *allegata* and *probata,* which to be availed of required the city to move either for an instructed verdict upon that specified ground, or upon that ground in its motion for a new trial. Neither of these courses was followed.

Kelly was not furnished a safe place in which to work by his employer, the city, as the jury by its verdict found. The insufficient insulation of the feed wire of the railway company rendered his position not only unsafe but, as the sequel showed, perilous to his life. This constituted actionable negligence.

There being no error in this record justifying a reversal of the judgment of the Circuit Court, it is affirmed.

*Affirmed.*