(No. 31298.

MATHILDA JOHNSTON, individually and as executrix, Appellee, *vs.* THE CITY OF EAST MOLINE, Appellant.

*Opinion filed March 22, 1950.*

BEN A. STEWART, and ROY H. GLOCKHOFF, both of East Moline, for appellant.

EAGLE & EAGLE, of Rock Island, for appellee.

Mr. JUSTICE SIMPSON delivered the opinion of the court:

Leave to appeal having been granted, the appellant, the city of East Moline, is asking that we reverse two judgments against it, one in favor of Matilda Johnston, individually, and one in her favor as executrix of the estate of Dr. James P. Johnston, deceased. The judgments were obtained in the circuit court of Rock Island County and affirmed by the Appellate Court. Motions for directed verdict and for judgment notwithstanding the verdict were made by appellant in the lower court but were denied. There was another defendant below but a severance was granted and the case proceeded against appellant, alone.

The principal point urged for determination is whether or not the municipality, in the construction, maintenance

and operation of automatic electric traffic signals, was engaged in a governmental function or in a corporate or proprietary one. The appellant contends it is not liable because the acts and omissions complained of occurred in the exercise of its governmental functions, whereas the respondent takes the view that the city was engaged in corporate duties for which it must respond in damages for its negligent conduct. Appellant also contends that the negligence alleged was not the proximate cause of the injury.

February 23, 1945, a collision between two automobiles resulting in the injuries complained of occurred at the intersection of Seventh Street and Seventeenth Avenue in the city of East Moline. At this point the former street runs north and south while the other runs east and west. Since 1928 the traffic moving over this intersection in both directions has been controlled by electric automatic traffic signals which displayed at regular intervals red, amber and green lights. Traffic lights were located on each corner of the intersection.

February 18, 1945, a standard supporting the traffic lights on the northwest corner of the intersection was knocked down and broken, taking it entirely out of operation. The city hall was but a short distance away and officers of the city learned that the standard was rendered useless soon after the occurrence and a record thereof was made. The standard was not replaced until March 3, following, although the city ordered the repairs promptly. The other three sets of signals were permitted to operate during the time the northwest signal was gone, but no control was exercised over the traffic moving west on Seventeenth Avenue, being that which the absent signal would have controlled.

February 23, 1945, at about 10:00 P.M., Matilda Johnston and her husband, the deceased, were riding south on Seventh Street in East Moline. He was driving the auto-

mobile and as they approached the intersection of Seventh Street with Seventeenth Avenue the traffic signal controlling their movement turned green and was still green as they entered the intersection traveling at about twenty miles per hour. The standard on the northwest corner, prior to its destruction, faced the east and controlled the traffic traveling west on Seventeenth Avenue. The standard on the southwest corner faces north and controls traffic going south on Seventh Street. A visor over each of the reflectors throws the light out into the street it faces but obscures the light to one traveling at right angles on the intersecting street.

Seventeenth Avenue is a main street through the city and carries a heavy volume of traffic, the westbound of which was without signal control at this intersection while the northwest standard was out of operation. From February 18 to the time of the accident in question a number of minor accidents occurred at this intersection and a number of collisions were narrowly avoided.

Immediately before the accident in question an automobile owned by Lester Thompson, driven by his son James L. Thompson, was proceeding west on Seventeenth Avenue. As it approached the intersection with Seventh Street there was no signal whatever controlling traffic in that direction. It entered the intesection at a speed of approximately twenty-five miles per hour, the driver not seeing the car of the deceased until it was too late to avoid a collision. The right front of the Thompson car came in contact with the left front of the Johnston car, throwing Johnston to the pavement. As he lay there unconscious another car, traveling west on Seventeenth Avenue, with no signals controlling its movement, ran through the intersection and across both of Johnston's legs. He died June 10, 1945, as a result of the injuries received in this collision.

It will be seen from the above that the deceased was, by the green light controlling his movement, invited into

and through the intersection without any effort being made by appellant to protect him from cross traffic. During the five and one-half days prior to the accident all like traffic moving over this intersection was subjected to the same hazard. It was indeed probable, under the conditions existing at this intersection during that period, that collisions would occur. The city was charged with knowledge of this fact but did nothing to cure the evil. As was said by the Appellate Court in its affirming opinion: "It was only a question of time under the conditions which the municipality permitted to exist at this intersection, until a serious accident happened."

We believe it was negligence for appellant to leave this intersection partly controlled and partly uncontrolled by traffic signals in the manner it did and that its negligence was the proximate cause of the injury. We said in *Neering* v. *Illinois Central Railroad Co.* 383 Ill. 366: "What constitutes proximate cause has been defined in numerous decisions, and there is practically no difference of opinion as to what the rule is. The injury must be the natural and probable result of the negligent act or omission and be of such a character as an ordinarily prudent person ought to have foreseen as likely to occur as a result of the negligence, although it is not essential that the person charged with negligence should have foreseen the precise injury which resulted from his act." The same rule is announced in *Illinois Central Railroad Co.* v. *Oswald*, 338 Ill. 270, and in *Hartnett* v. *Boston Store*, 265 Ill. 331.

An intervening and efficient cause is a new and independent force which breaks the causal connection between the original wrong and the injury and itself becomes the direct and immediate cause of the injury. (*Pullman Palace Car Co.* v. *Laack*, 143 Ill. 242; *Illinois Central Railroad Co.* v. *Oswald*, 338 Ill. 270.) The intervention of independent concurrent or intervening forces will not break causal connection if the intervention of such forces was,

itself, probable or foreseeable. *Sycamore Preserve Works* v. *Chicago and Northwestern Railway Co.* 366 Ill. 11; *Wintersteen* v. *National Cooperage and Woodenware Co.* 361 Ill. 95; *Garibaldi & Cuneo* v. *O'Connor,* 210 Ill. 284; *Armour* v. *Golkowska,* 202 Ill. 144.

Can the city evade responsibility for this injury on the theory that its acts and omissions were in the exercise of its governmental function? There is no controversy concerning the material facts as above enumerated. A municipality is not liable in damages for injuries to persons resulting from the negligence of its agents and servants while in the exercise of its governmental functions, (*Le-Pitre* v. *Chicago Park Dist.* 374 Ill. 184; *Gebhardt* v. *Village of LaGrange Park,* 354 Ill. 234,) but it is equally well settled that a municipality is liable for the negligence of its servants in the exercise of its corporate duties as distinguished from governmental functions. *Gravander* v. *City of Chicago,* 399 Ill. 381; *Roumbos* v. *City of Chicago,* 332 Ill. 70; *Hanrahan* v. *City of Chicago,* 289 Ill. 400; *City of Chicago* v. *Seben,* 165 Ill. 371.

There was no statute requiring appellant to construct and maintain automatic signal devices at the intersection in question. (Cahill Illinois Rev. Stat. 1927, chap. 95a, secs. 26 and 33, pars. 27 and 34; Ill. Rev. Stat. 1943, chap. 95½, sec. 30, par. 127.) Its action in this connection was voluntary. It had the power to provide for them if in its discretion they were necessary, but it was not required to do so. There is no claim that appellant was negligent in the exercise of its discretion to provide such system, or in the original construction of it. Whether in those matters it was in the exercise of a governmental function or a corporate duty is not, therefore, before us. The question of what the city did or permitted at the intersection, in the matter of controlling or not controlling traffic after the northwest standard was removed, is before us, and whether or not its acts and omissions in that regard

were in the exercise of a governmental function or a corporate duty must be decided.

As early as *City of Chicago* v. *Powers,* 42 Ill. 169, the principle was recognized that where a municipality undertakes to protect a street or bridge by lights it is liable for negligence if it does it in an insufficient manner. In *City of Freeport* v. *Isbell,* 83 Ill. 440, the same principle is enunciated and the *Powers case* is cited, the court saying with reference to it: "In the case referred to, the city had lighted a certain bridge where the accident occurred, as well as the street; but the injury arose from the fact that the light furnished by the city was insufficient to afford proper protection." In the *Isbell case* the city had omitted to light a portion of the street. It was held not liable but the court said: "In this case, if the city of. Freeport, under the power conferred by the charter, had assumed to light the street where the accident occurred, but had exercised the power in a negligent manner, and had failed, in the exercise of the power, to furnish lights sufficient to afford proper security from danger, a different rule would prevail, and the rule announced in the case cited [*Powers case*] would govern."

A municipal corporation acts judicially or exercises discretion when it selects and adopts a plan in the making of public improvements, but as soon as it begins to carry out that plan it acts ministerially and is bound to see that the work is done in a reasonably safe and skillful manner. *Johnston* v. *City of Chicago,* 258 Ill. 494; *City of Chicago* v. *Seben,* 165 Ill. 371; 4 Dillon on Mun. Corp. (5th ed.) sec. 1741.

A rule determining when a municipality is exercising a public or governmental function as distinguished from a strictly corporate duty is difficult to formulate. It has been said more than once that all that can be done with safety is to determine each case as it arises. See *Johnston* v. *City of Chicago,* 258 Ill. 494, 497, wherein is cited

*Lloyd* v. *New York*, 5 N.Y. 369, and *Cobb* v. *Dalton*, 53 Ga. 426. In the *Johnston case* the city was held liable for negligence of a driver of an automobile hired by the library board which was part of the city government and who at the time of the accident was conveying books from one library building to another along the streets of Chicago. On page 497 of that opinion, the court, speaking through Mr. Justice Carter, said: "It is frequently stated that to determine whether there is municipal responsibility the inquiry must be whether the particular agents or servants for whose acts of negligence it is sought to hold the corporation are its agents and servants for the performance of a public duty imposed by law, or merely for the carrying out of private functions which are for its special benefit or advantage. [Citations.]" In the same case it was said that the mere fact that a particular work may incidentally benefit the public does not necessarily exempt the city from liability for torts committed by its employees.

It appears that appellant was specially benefited by the signal system, along with the public generally. The evidence shows that Seventeenth Avenue carried heavy traffic. The traffic on Seventh Street was also heavy and consisted mainly of travel between the business and residence districts of the city. It no doubt was difficult to enter or cross Seventeenth Avenue at the intersection. Being unable to cross readily, traffic would necessarily accumulate and congest in the city streets, whereas if it were intermittently protected in its movements across Seventeenth Avenue the congestion would not occur in so great volume. Congestion of automobile traffic in a street may lead to delay, inconvenience and damage to citizens.

We said in *Roumbos* v. *City of Chicago*, 332 Ill. 70, that it has always been the doctrine of this court that while the legal obligation of the city to construct gutters and sewers is one which is voluntarily assumed, yet, having assumed the obligation and constructed these improvements

for the benefit of the public, it then becomes the duty of the city to see that they are kept in repair. That same principle applies here. In the *Roumbos case* the city was held liable for the negligence of a street cleaner who set fire to a pile of rubbish and negligently left it burning without watching it and the flames blew across the sidewalk, igniting the clothing of a child causing her death. It was also stated in that case that the care of streets and sidewalks, lighting and maintenance, have always been held in this State to be the corporate functions of the municipality, and that the municipality has been held liable for the negligence of its employees in the performance of those functions which has resulted in injury to others. Appellant having elected to install, and having installed the signal system in question, it was a corporate duty not to permit its operation in a manner calculated to cause injury to others. In permitting the signal lights on the three corners of the intersection to operate while those at the northwest corner were completely out of service it failed to perform a corporate duty.

Appellant cites cases in many foreign jurisdictions where municipalities have avoided liability under similar facts because the acts complained of were held to have occurred in the exercise of a governmental function. Most of the cited cases are set forth in the opinion of the Appellate Court (338 Ill. App. 220,) and it will not be necessary for us to cite any of them here. A majority of the decisions of other States seem to uphold appellant's position. Justice and reason, however, impel us to the conclusion that after the signal system in question was constructed and in operation, the keeping of it in such condition that it would not inevitably be hazardous and invite citizens into danger was a corporate duty, for the failure of which liability was incurred.

In our opinion, both the circuit and the Appellate courts were right in their decisions and the judgments are affirmed.

*Judgments affirmed.*